**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLORADO**

Civil Action No. 1:19-cv-00510-DDD-MEH

OTTER PRODUCTS, LLC, and
TREEFROG DEVELOPMENTS, INC.,

      Plaintiffs/Counter-Defendants,

       v.

TRIPLENET PRICING INC.,

      Defendant/Counter-Claimant,

      and

TRIPLENETPRICING LLC,
ERIC SYPES, and
JOHN DOES 1-10, individually or as corporate/business entities,

      Defendants.

---

**PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFFS'
CLAIMS AND FOR SUMMARY JUDGMENT ON ALL OF DEFENDANT TRIPLENET
PRICING INC.'S COUNTERCLAIMS**

---

## I.    INTRODUCTION

This case is about the unlawful use of Plaintiffs' trademarks to anonymously advertise and sell non-genuine, materially different products bearing Plaintiffs' trademarks on www.amazon.com ("Amazon").   Defendants Triplenet Pricing, Inc. and Triplnetpricing, LLC ("Defendants") operate a third-party storefront on Amazon where they claim to be selling new, genuine products bearing Plaintiffs' trademarks that come with Plaintiffs' warranty.   These representations are false.   The truth is that Defendants do not care about Plaintiffs' trademarks, Plaintiffs' quality controls, or the fact that they are falsely advertising that the products they sell come with Plaintiffs' warranty.   Indeed, the uncontroverted evidence establishes that Defendants are selling non-genuine, materially different products bearing Plaintiffs' trademarks that do not come with Plaintiffs' warranty and that are not subject to, and interfere with, Plaintiffs' legitimate and substantial quality controls.   The uncontroverted evidence – including an unrebutted consumer survey conducted by Dr. Charles Cowan – also shows that Defendants' actions create consumer confusion and harm Plaintiffs.

Plaintiffs are entitled to summary judgment against Defendants on their trademark infringement and unfair competition claims (Counts 1, 3, and 5) and their false advertising and deceptive trade practices claims (Counts 2 and 6).[1]   Moreover, Plaintiffs are entitled to summary judgment on Defendant Triplenet Pricing Inc.'s counterclaims because: (1) no issue of fact exists regarding Defendant's infringement of Plaintiffs' trademarks; and (2) Defendants have no evidence that Plaintiffs engaged in an unfair trade practice or interfered with Defendants' business contracts or relationships.

---

[1] Plaintiffs do not seek summary judgment against Defendant Eric Sypes.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Plaintiffs Are Harmed By Unauthorized Sales of Products Bearing Their Trademarks, Particularly on Amazon Where Such Sales Are Rampant

1.   Plaintiffs manufacture and market mobile device, smartphone, and tablet accessories under the OtterBox® and LifeProof® brands ("Otter Products") that are protected by registered trademarks (the "Otter Trademarks").  (Declaration of Kevin McPherson ("McPherson Decl.") at ¶¶3-4; Ex. 1, USPTO printouts.)

2.   Defendants sell products bearing Otter Trademarks without Plaintiffs' authorization on the Internet, including on Amazon through a storefront called "Triplenet Pricing INC."  (Dkt. No. 29, Scheduling Order, at 6; Ex. 11, Deposition of Yisroel Blackman, at 10:24-11:14.)

3.   Amazon is the largest e-commerce platform in the United States, and products are sold on Amazon by either Amazon itself or by third party ("3P") sellers like Defendants.  (Ex. 19, Expert Report of Cathy Ceely, at ¶¶8-9, 11, 16.)

4.   3P Amazon sellers often sell products that are counterfeit, damaged, defective, and even retrieved from dumpsters – as Amazon has admitted in disclosures to its shareholders.  (Ex. 2, collection of business press articles; Ex. 12, 2018 Amazon Form 10-K. at 14; McPherson Decl at ¶5.)

5.   3P sellers can peddle these goods because: (1) online customers cannot inspect items before purchase; (2) Amazon does not review or approve 3P sellers before they begin selling on the Amazon platform; (3) Amazon permits 3P sellers to sell anonymously, allowing sellers to sell poor quality products without fear of harm to their reputation; and (4) 3P sellers' anonymity and other features of Amazon's platform cause consumers to incorrectly believe that they are

always purchasing products from manufacturers or "Amazon" when they purchase on Amazon. (Ex. 19 at ¶¶13, 15, 17-22, 36, 37(a), 37(b), 45.)

6.      For example, Amazon allows one listing for every product on its platform and lists all sellers of a product—authorized or not—under the same product listing.   Amazon then automatically populates one seller into the "Buy Box" for each product, which is the seller from whom the customer will purchase a product if the customer clicks "Add to Cart."  The identity of the occupant of the "Buy Box" is not highlighted or obvious to consumers, creating confusion about how products are sold on Amazon and the identities of sellers.  (Ex. 19 at ¶¶17-22.)

7.      This confusion was confirmed in a consumer survey conducted by Dr. Cowan. There consumers were shown an Otter Product with an unauthorized seller in the "Buy Box." Nearly 60% of the respondents thought the product was being sold by OtterBox (46%) or Amazon (13%).  Only 33% of respondents recognized that the seller was the unauthorized seller.  (Ex. 20, Expert Report of Charles Cowan, at 7-9, 32, 41.)

8.      These practices harm manufacturers and their intellectual property.  In November 2019, a Senate Finance Committee report found that counterfeit products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms, these sales are a "significant threat" to rights holders' brands and to consumers, and online marketplace practices such as commingling the inventory of different third-party sellers contribute to this problem.  (Ex. 13, Senate Report, at 3-9.)

9.      These practices also threaten manufacturers' reputation and goodwill.  When poor-quality products are sold on Amazon, customers leave negative reviews that are grouped together by product and do not identify the seller at fault.  As a result, the manufacturer's quality and

reputation is called into question even though an unauthorized seller made the sale.  (Ex. 19 at ¶¶23-24, 28-33.)

10.     Negative product reviews on Amazon significantly harm a brand's reputation and sales because: (1) consumers rely heavily on Amazon reviews, even when shopping elsewhere; (2) consumers are less likely to buy products with poor reviews; and (3) products with poor reviews are given worse placement in Amazon search results by Amazon's algorithms.  (Ex. 19 at ¶¶28, 30-33.)

11.     There are numerous negative reviews of Otter Products on Amazon where consumers report that they purchased products advertised as "new" that were damaged, defective, previously used, counterfeit, different from what was advertised, or of otherwise poor quality. (McPherson Decl. at ¶7; Ex. 19 at ¶38; Dkt. No. 1, Complaint, at ¶¶53-58.)

12.     Customers also complain directly to Plaintiffs about counterfeit products they purchased on Amazon.  (McPherson Decl. at ¶8.)

**B.      Plaintiffs Implemented Substantial Quality Controls and Restricted Internet Sales to Protect Consumers and the Value of the Otter Trademarks**

13.     In response to these issues, Plaintiffs implemented a quality control program that applies to every authorized seller of Otter Products ("Authorized Sellers").  (McPherson Decl. at ¶9.)

14.     Plaintiffs allow Otter Products to be sold to consumers only by Plaintiffs themselves (through direct-to-consumer websites) or by Plaintiffs' network of Authorized Sellers, which include distributors, retailers, and resellers who have agreed to Plaintiffs' terms (collectively, the "Otter Agreements").  (McPherson Decl. at ¶10; Ex. 19 at ¶7.)

15.     Pursuant to the Otter Agreements, Authorized Sellers must comply with substantial quality control requirements including:

- Inspecting Otter Products promptly upon receipt, removing products from inventory that are damaged or show signs of tampering, and reporting such products to Plaintiffs;

- Storing and handling Otter Products in accordance with instructions provided by Plaintiffs;

- Cooperating with any recall or other consumer safety information dissemination effort conducted by Plaintiffs, as well as any investigation by Plaintiffs into product quality;

- Not relabeling, repackaging, or otherwise altering any Otter Product, any accompanying literature, or serial number;

- Not selling Otter Products to anyone who is not an Authorized Seller and who intends to resell the products; and

- Reporting any safety issues or complaints about Otter Products to Plaintiffs.

(Ex. 3, Otter Agreements, at Otter-Triplenet00000012-13, 00000015-18, 00000030-31, 00000106-109, 00000137-139, 00000157; Ex. 14, Deposition of Kevin McPherson, at 7:16-9:3.)

16.     Except for a small subset of Plaintiffs' Authorized Sellers who purchase Otter Products directly from Plaintiffs for retail sale to end users on their own websites, Authorized Sellers are permitted to sell Otter Products online only if they submit an application, pass Plaintiffs' vetting, and obtain Plaintiffs' permission to sell on specific websites.  Authorized Sellers must provide substantial information including their full legal name, business information, any history of bankruptcy or lawsuits, storage protocols, their sources of Otter Products, and the specific website(s) and/or online storefront names where they seek to sell Otter Products.  (Ex. 3 at Otter-Triplenet00000012, 00000015, 00000017, 00000030, 00000137; Ex. 4, Authorized Online Seller Application, at Otter-Triplenet00000090-91; Ex. 5, internal communications regarding denial of online seller application; Ex. 6, Online Quality Control Policy, at Otter-Triplenet00000055-56.)

17.     All Authorized Sellers approved to sell online ("Authorized Online Sellers") must comply with additional quality control requirements, including:

- Selling Otter Products only on the specific approved website(s) or storefront names;

- Conspicuously stating their business name and current contact information on all approved sites, and not selling anonymously under any circumstances;

- Expending reasonable efforts to address any negative feedback or reviews regarding Otter Products; and

- Upon request, providing Plaintiffs with all feedback received from consumers and cooperating with Plaintiffs in any investigation of negative reviews.

(Ex. 4 at Otter-Triplenet00000092-93; Ex. 6 at Otter-Triplenet00000056-57; Ex. 14 at 12:25-13:21.)

18.     Plaintiffs prohibit anonymous online sales and permit Authorized Online Sellers to sell only on specific websites so that: (1) Plaintiffs will know where their products are being sold online; and (2) Plaintiffs and consumers can identify sellers who sell poor quality products, allowing Plaintiffs to take appropriate action.  (McPherson Decl. at ¶12.)

19.     To combat the problems on Amazon, Plaintiffs have limited their authorized Amazon sellers ("Authorized Amazon Sellers") to a select few who must comply with additional quality controls, including:

- Authorized Amazon Sellers must opt of Amazon's "commingling" practice and apply tracking stickers to ensure that product orders are not fulfilled in any way that could potentially result in customers receiving products (such as damaged, defective, or counterfeit products) from another Amazon seller's stock;

- They must place a sticker on Otter Products they sell which state that the products were sold by an authorized seller.

(Ex. 4 at Otter-Triplenet00000093-94; Ex. 6 at Otter-Triplenet00000057-58; Ex. 14 at 16:20-24, 18:8-14.)

20.      3P sellers on Amazon may choose to use a service called "Fulfillment by Amazon" ("FBA"), whereby they ship products to Amazon fulfillment centers and Amazon ultimately ships the products to consumers.  There Amazon commingles products received from a 3P seller with inventory of other 3P sellers unless the seller takes affirmative steps to opt-out, incurs additional costs, and applies inventory tracking stickers to its products.  (Ex. 19 at ¶37(a); Ex. 13 at 9.)

21.      Plaintiffs follow the same quality controls required of Authorized Sellers when Plaintiffs sell Otter Products directly to consumers.   (McPherson Decl. at ¶16.)

22.      Plaintiffs exercise quality controls throughout their authorized channels of distribution to ensure that all Otter Products have been subject to their quality controls. (McPherson Decl. at ¶17.)

**C.      Plaintiffs Monitor and Audit Their Authorized Sellers**

23.      Plaintiffs audit their brick-and-mortar Authorized Sellers by inspecting their warehouses and retail locations to confirm they are complying with Plaintiffs' quality controls. (Ex. 14 at 8:14-9:6, 10:6-12:7, 30:17-24.)

24.      Plaintiffs require their distributors to report every customer to whom they sell Otter Products, to ensure they have not sold products to non-Authorized Sellers who are outside of Plaintiffs' quality controls.  (Ex. 14 at 23:4-22.)

25.      Plaintiffs audit their Authorized Online Sellers every quarter by:

- Examining every website and website storefront they have approved ("Approved Website") to confirm compliance with Plaintiffs' requirements;

- Inspecting all reviews of Otter Products on Approved Websites that have been posted since Plaintiffs' previous inspection; and

- Purchasing an Otter Product from every Approved Website to ensure compliance with Plaintiffs' quality control requirements.

(Ex. 6 at Otter-Triplenet00000058-59; Ex. 14 at 34:11-35:9; Ex. 7, Online Quality Control Auditing Program Worksheets.)

26.     If an audit reveals deficiencies, Plaintiffs investigate the cause and may visit Authorized Online Sellers' facilities.  Plaintiffs take corrective action against Authorized Online Sellers that do not follow their quality control requirements.  (Ex. 6 at Otter-Triplenet00000058-59; Ex. 14 at 15:14-20.)

**D.      Plaintiffs Provide a Warranty for Products Subject to Their Quality Controls**

27.     Plaintiffs provide a warranty ("Otter Warranty") for all Otter Products purchased by consumers from Plaintiffs or an Authorized Seller ("Covered Products").  For a specified warranty period, Plaintiffs will repair or replace a Covered Product that has a defect in manufacturing, materials, or workmanship.  (Ex. 8, OtterBox Global Limited Warranty and LifeProof Global Limited Warranty.)

28.     Because Plaintiffs have no control over the quality of products sold by unauthorized sellers, the Otter Warranty does not cover products sold by unauthorized sellers—including the products sold by Defendants.  (Ex. 14 at 15:21-16:3, 19:25-20:9; Ex. 9, Global Warranty Policy, at Otter-Triplenet00000021.)

**E.      Defendants Interfere With and Do Not Abide By Plaintiffs' Quality Controls**

29.     Following implementation of Plaintiffs' quality control program, Amazon users continue to post negative reviews complaining that they purchased Otter Products advertised as "new" that were of poor quality.  Consumers post these reviews because many 3P sellers on Amazon are unauthorized sellers who are not subject to Plaintiffs' quality controls.  (McPherson Decl. at ¶18.)

30.     Defendants are not Authorized Sellers and are selling products outside of Plaintiffs' quality controls.  (Dkt. No. 29 at 6; Dkt. No. 32, Answer and Counterclaims, at ¶¶110, 111, 229, 366; Ex. 11 at 132:6-13.)

31.     Defendants believe that manufacturers like Plaintiffs have no right whatsoever to control who sells their products.  (Ex. 11 at 144:13-16)

32.     Defendants are oblivious to Plaintiffs' quality control measures, have never spoken with Plaintiffs, and have not received any instructions or training regarding Otter Products, Plaintiffs' customer service requirements, or how to determine if products bearing the Otter Trademarks are counterfeit.  (Ex. 11 at 10:4-11, 13:15-14:9, 23:14-17, 107:24-108:10, 142:18-143:21.)

33.     Defendants have never acquired any Otter Products from Plaintiffs.  Instead, Defendants acquire all of the products they resell from Discover Group, Inc., which is not an Authorized Seller.  (Ex. 11 at 42:20-44:16, 53:2-5.)

34.     Defendants typically list products bearing the Otter Trademarks for sale that they do not have in their possession.  When customers purchase products, Defendants order the products, receive them, and then immediately pack and ship them to customers.  (Ex. 11 at 118:10-23, 152:17-153:20.)

35.     Defendants used Amazon's "FBA" service in the past and did not opt out of Amazon's "commingling" practice.  (Ex. 11 at 31:3-21, 35:19-36:17.)

36.     Defendants' Amazon storefronts do not disclose the name of their business or any contact information except for a phone number.  (McPherson Decl. at ¶19; Ex. 19 at ¶16.)

37.     Defendants have sold approximately 525 orders of products bearing the Otter Trademarks.  Defendants' records show that approximately 70 of these orders were cancelled, often because Defendants failed to send products or communicate with customers.  (Ex. 15, Defendants' sales records, at 49-64; Ex. 16, Defendants' order cancellation records; Ex. 17, supplemental discovery responses, at 1-2; Ex. 11 at 75:1-17, 91:10-23.)

38.     Defendants' Amazon accounts have been suspended by Amazon more than five times because of customer complaints that Defendants sold counterfeit products, shipped products late, or cancelled too many orders.  (Ex. 11 at 127:12-128:16.)

39.     Defendants' Amazon sales interfere with Plaintiffs' ability to implement their quality controls because:

- Customers and Plaintiffs do not know Defendants' identities nor do customers know that Defendants are not Authorized Sellers not subject to Plaintiffs' quality controls;

- Plaintiffs' cannot recall products sold by Defendants or disseminate consumer safety information to Defendants' customers;

- Plaintiffs cannot audit Defendants and their facilities to confirm that they are following Plaintiffs' quality control requirements, not selling counterfeit products, obtaining products only from Authorized Sellers, and not selling products to unauthorized sellers who intend to resell the products; and

- Plaintiffs cannot take corrective action if Defendants do not comply with Plaintiffs' quality control requirements.

(McPherson Decl. at ¶¶19-20.)

**F.     Consumers Expect Otter Products Sold on Amazon to be Subject to Plaintiffs' Quality Controls and are Likely to Write Negative Reviews if they Purchase Poor Quality Products**

40.     In Dr. Cowan's survey, respondents were asked about their expectations when purchasing an Otter Product on Amazon:

- More than 81% of respondents expect an Otter Product to have been inspected according to the manufacturer's requirements before shipment;

- More than 85% of respondents expect an Otter Product to have been handled according to the manufacturer's quality control requirements;

- More than 83% of respondents expect an Otter Product to have been shipped according to the manufacturer's requirements;

- More than 80% of respondents reported that they would be "much more likely" or "somewhat more likely" to purchase an Otter Product on Amazon if the product were inspected according to the manufacturer's requirements before shipment; and

- More than 65% of respondents "definitely would" or "probably would" leave a negative review of an Otter Product on Amazon if they received a product that was damaged, defective, or of otherwise poor-quality.

(Ex. 20 at 10-14, 32-33, 41-42.)

### G.    Defendants' Products Do Not Come With the Otter Warranty

41.    Because Defendants are unauthorized sellers not subject to Plaintiffs' quality controls, the Otter Warranty does not cover the products they sell.  (Ex. 8; Ex. 9, at Otter-Triplenet00000021.)

42.    Defendants do not disclose to consumers that the Otter Warranty does not cover the products they sell.  (McPherson Decl. at ¶25.)

### H.    The Otter Warranty is Material to Consumers

43.    In Dr. Cowan's survey:

- More than 85% of respondents reported that they were "much more likely" or "somewhat more likely" to purchase an Otter Product on Amazon if the product included the manufacturer's warranty;

- Approximately 60% of respondents who viewed an Otter Product listing reported that they believed the product came with the manufacturer's warranty, while approximately 30% were unsure; and

- Approximately 80% of respondents answered that they "definitely would" or "probably would" leave a negative review of an Otter Product on Amazon if they received a defective unit and could not get a replacement under the manufacturer's warranty.

(Ex. 20 at 10-13, 32-34, 41-43.)

### I.   Defendants Falsely Advertise Products Bearing the Otter Trademarks

44.   Listings of Otter Products on Amazon state: "Includes OtterBox limited lifetime warranty (see website for details) and 100% authentic."  (McPherson Decl. at ¶24.)



45.   Plaintiffs informed Defendants that the products they sell are not covered by the Otter Warranty in cease-and-desist letters sent on November 9, 2018 and January 15, 2019. Defendants "primarily ignore[d]" the letters and continued selling products. (Ex. 18, cease-and-desist letters, at 6, 38-39; Ex. 11 at 124:2-4; 125:24-126:12.)

46.   Despite learning that their products are not covered by the Otter Warranty, Defendants have continued to list products as "New" on listings for Otter Products which state that the products include the Otter Warranty.  (Dkt. No. 1 at ¶¶164-165;  Dkt. No. 32 at ¶¶164-165; Ex. 11 at 57:3-6, 57:17-58:2, 124:4-125:15.)

47.     Amazon's "Condition Guidelines" state that products should be listed as "New" only if the "Original manufacturer's warranty, if any, still applies, with warranty details included in the listing comments."  (Ex. 10, Amazon Condition Guidelines; Ex. 14 at 25:16-21.)

**J.      Defendants' Second, Third, and Fourth Counterclaims Are Based on a False Allegation**

48.     Plaintiffs have never communicated with any third party—including Amazon—about Defendants' sales of products.  Plaintiffs have also never reported to Amazon or any other third party that Defendants sell counterfeit products.  (McPherson Decl. at ¶27, Ex. 14 at 24:1-16.)

**III.    LAW AND ARGUMENT**

**A.      Standard of Review**

Under Fed. R. Civ. P. 56, summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir. 1993).

**B.      Plaintiffs are Entitled to Summary Judgment on their Trademark Infringement and Unfair Competition Claims.**

Plaintiffs' first, third, and fifth causes of action are analyzed under the same framework. *See Derma Pen, LLC v. 4EverYoung Ltd.*, 773 F.3d 1117, 1120 (10th Cir. 2014); *Cleary Bldg. Corp. v. David A. Dame, Inc.*, 674 F. Supp. 2d 1257, 1270 (D. Colo. 2009).   Trademark infringement or unfair competition claims require plaintiff to establish that: (1) it owns a protectable interest in a trademark; (2) the defendant used an identical or similar mark in commerce; and (3) through its use, defendant created a likelihood of confusion.  *See* 15 U.S.C. §§ 1114(1)(a), 1125(a)(1)(A); *Derma Pen, LLC*, 773 F.3d at 1120.

When, as here, a defendant is reselling products the plaintiff manufactured that bear the plaintiff's actual trademarks, the defendant's sales are likely to create confusion if the products are: (1) "materially different" from products sold by the plaintiff (the "material difference exception"); **or** are (2) outside of and interfere with the plaintiff's legitimate quality controls (the "quality control exception"). *Otter Products, LLC v. Cloudseller, LLC*, No. 19-cv-00630-JLK, 2019 U.S. Dist. LEXIS 224515, *18-19 & n.4 (D. Colo. Dec. 3, 2019) (collecting cases); *Skullcandy, Inc. v. Filter USA, Inc.*, No. 2:18-CV-00748-DAK, 2019 WL 2568010, *4-5 (D. Utah June 21, 2019) (same); *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243-44 (2d Cir. 2009). If **either** condition exists, the products sold by the defendant are deemed "not genuine," there is a presumption of a likelihood of consumer confusion, and defendant cannot invoke an affirmative defense called the "first sale doctrine." *Id.* at *15-17; *Abbott Labs v. Adelphia Supply United States*, No. 15-CV-6002, 2019 WL 5696148, *4 (E.D.N.Y. Sep. 30, 2019) (explaining that "material difference" and "quality control" tests are "proxies for the fundamental question under the Lanham Act: whether consumer confusion is likely."); *Societe Des Produits Nestle, S.A., v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992).

Here, the undisputed evidence shows that Plaintiffs own protectable trademarks that Defendants are using in commerce. *See* Statement of Undisputed Material Facts ("Stmt. Facts") at ¶¶ 1-2. The undisputed evidence also shows that Defendants' use creates a likelihood of consumer confusion.

### 1.   Defendants Are Creating a Likelihood of Confusion by Selling Materially Different Products That Do Not Come with the Otter Warranty

A material difference is any difference that "consumers consider relevant to a decision about whether to purchase a product." *Davidoff & Cie., S.A. v. PLD Int'l Corp.*, 263 F.3d 1297,

1302 (11th Cir. 2001).  Numerous courts have held that products are materially different if they do not include a manufacturer's warranty.  *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1073 (10th Cir. 2009) (collecting cases); *TracFone Wireless, Inc. v. Pak China Group Co.*, 843 F. Supp. 2d 1284, 1297 (S.D. Fla. 2012).

Here, the undisputed evidence establishes that: (1) the products sold by Defendants are not covered by the Otter Warranty because Defendants are not Authorized Sellers, Stmt. Facts ¶ 41; (2) Defendants do not disclose that their products are not covered by the Otter Warranty; and instead falsely represent the opposite, *id* ¶¶ 42, 44-46; (3) a majority of consumers (60% of the respondents to Plaintiffs' consumer survey) expect their products to be covered by the Warranty when they purchase Otter Products on Amazon, *id.* ¶ 43; and (4) a large majority of consumers (more than 80% of respondents) are more likely to purchase Otter Products if they include the Warranty and would likely leave negative product reviews if they learned after their purchase that their product was not covered by the Warranty, *id.*, showing that the Warranty is material to their purchasing decision and that Defendants are creating a likelihood of confusion.

In light of this, Plaintiffs are entitled to summary judgment under the material difference exception to the first sale doctrine.  *See RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 704-711 (S.D. Tex. 2009) (granting summary judgment for plaintiff primarily because of consumer survey showing actual confusion in 25.3% of respondents, and collecting cases in which 10% confusion rate was sufficient to find likelihood of confusion); *RFA Brands, LLC v. Beauvais*, No. 13-14615, 2014 WL 7780975, *9 (E.D. Mich. Dec. 23, 2014) (granting summary judgment for plaintiff in part because products sold by defendant were not covered by plaintiff's warranty); *cf. Heraeus Kulzer LLC v. Omni Dental Supply*, No. 12-11099-RGS, 2013

WL 3305284, *6-7 (D. Mass. July 1, 2013) (concluding that undisputed difference in warranty coverage created presumption of consumer confusion and denying summary judgment for plaintiff only because of evidence that defendant had disclaimer on its website).

### 2. Defendants Are Creating a Likelihood of Confusion by Selling Non-Genuine Products that Interfere With and Do Not Abide By Plaintiffs' Quality Controls

A trademarked product is not "genuine," and its resale is not protected by the first sale doctrine, if the manufacturer has established quality controls and the product at issue is not subject to those quality controls. *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996). This follows because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *Skullcandy*, 2019 WL 2568010, at *6 (quoting *Warner-Lambert*, 86 F.3d at 6). Accordingly, unauthorized sellers infringe a plaintiff's trademarks if they resell products bearing the plaintiff's marks and "(i) [the plaintiff] has established legitimate, substantial, and non-pretextual quality control procedures, (ii) [the plaintiff] abides by these procedures, and (iii) the non-conforming sales will diminish the value of the mark." *Warner-Lambert*, 86, F.3d at 6; *see also Otter Products*, 2019 U.S. Dist. LEXIS 224515, at *21. After establishing these factors, a mark holder must then show "that the unauthorized reseller either failed to abide by the trademark holder's quality controls, or interfered with the trademark holder's ability to implement its quality controls." *Skullcandy*, 2019 WL 2568010, at *7.[2]

---

[2] *See also Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) ("Where the alleged infringer has interfered with the trademark holder's ability to control quality, the trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark.");

The undisputed evidence establishes each element. *First*, because of the threats to their consumer goodwill and the likelihood of consumer confusion created by new market dynamics driven by the rise of Amazon, Plaintiffs implemented extensive quality controls throughout their authorized channels of distribution. *See* Stmt. Facts ¶¶3-22 (describing perils of Amazon and Plaintiffs' quality controls). *Second*, Plaintiffs follow their quality controls and require Authorized Sellers to follow their quality controls. *Id.* ¶¶13-22. Indeed, Plaintiffs audit and monitor their Authorized Sellers to ensure compliance. *Id.* ¶¶23-26. *Third*, unauthorized sales outside Plaintiffs' quality controls diminish the value of the Otter Trademarks. Unauthorized 3P Amazon sellers frequently sell poor quality products, *id.* ¶¶4-5, 8, and these sales diminish the value of the Otter Trademarks because many customers on Amazon have blamed quality problems on Plaintiffs rather than the seller in both publicly posted reviews and complaints to Plaintiffs that harm Plaintiffs' reputation and sales. *Id.* ¶¶5-12. *Finally*, Defendants fail to abide by Plaintiffs' quality controls and interfere with Plaintiffs' ability to implement their quality controls in numerous ways, as detailed in the Statement of Undisputed Material Facts. *Id.* ¶¶ 29-39.

Significantly, Plaintiffs' survey also shows that Defendants' sales diminish the value of the Otter Trademarks and create a likelihood of confusion because: (1) consumers expect Otter Products sold on Amazon to be inspected, handled, and shipped according to Plaintiffs' quality control requirements; (2) consumers believe that Otter Products sold on Amazon by unauthorized

---

*API v. Cooper*, 718 F.3d 347, 359 (4th Cir. 2013) ("The actual quality of the goods is irrelevant; it is the control of the quality that a trademark holder is entitled to maintain."); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) (explaining that the "harm" in quality control cases "stems not from the actual quality of the goods (which is legally irrelevant) but rather from [the plaintiff's] loss of control over the quality of goods that bear its marks.").

sellers are actually sold by Plaintiffs or their authorized sellers; and (3) consumers are likely to write negative reviews if they receive poor-quality products on Amazon. *Id.* ¶¶ 7, 40.

Based on the foregoing, Plaintiffs are also entitled to summary judgment under the "quality control" exception to the first sale doctrine. *See Abbott Labs*, 2019 WL 5696148, at *3, 6 (granting summary judgment to plaintiff under quality control exception).

## C. Plaintiffs are Entitled to Summary Judgment on Their False Advertising Claim

A false advertising claim under the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), requires a plaintiff to show: "(1) that defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of its product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to (a) the origin, association or approval of the product with or by another, or (b) the characteristics of the goods or services; and (4) injure the plaintiff." *Digital Ally, Inc. v. Util. Assocs.*, 882 F.3d 974, 978 (10th Cir. 2018).

The undisputed evidence establishes each of these elements. Defendants are making false representations of fact in commerce by knowingly advertising and selling products that are not covered by the Otter Warranty as "new" on Amazon listings which state that products are covered by the Warranty. *See* Stmt. Facts ¶¶44-46; *Jae Enters. Oxgord Inc.*, No. 5:15-CV-228-TBR, 2016 WL 865328, *7-8 (W.D. Ky. Mar. 2, 2016) (defendant liable for false advertising because it listed products for sale on Amazon detail page that differed from description on page: "Defendants effectively made a false statement in a commercial advertisement."); *Vitamins Online, Inc. v. Heartwise, Inc.*, 207 F. Supp. 3d 1233, 1240 (D. Utah 2016) ("[T]o fall within the text of the Lanham Act, a defendant does not need to *make* a statement but only needs to *use* a statement or other form of conduct specified in the Act."). In addition, Defendants' misrepresentations are

material, likely to cause confusion, and injure Plaintiffs because consumers: (1) expect products to be covered by the Otter Warranty when they purchase on Amazon, Stmt. Facts ¶43; and (2) are likely to leave negative product reviews of Otter Products on Amazon if they learn after the time of purchase that their products are not covered by the Otter Warranty. *Id*.

### D.       Plaintiffs are Entitled to Summary Judgment on Their Deceptive Trade Practices Claim

To prevail on a deceptive trade practices claim under the Colorado Consumer Protection Act ("CCPA"), CRS § 6-1-101 *et seq*., plaintiff must show that: (1) the defendant engaged in an unfair or deceptive trade practice; (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation; (3) the challenged practice significantly impacts the public as actual or potential consumers of the defendant's goods, services, or property; (4) the plaintiff suffered injury in fact to a legally protected interest; and (5) the challenged practice caused the plaintiff's injury. *Rhino Linings United States v. Rocky Mt. Rhino Lining*, 62 P.3d 142, 146-47 (Colo. 2003). An "unfair or deceptive trade practice" includes: (i) "knowingly … mak[ing] a false representation as to the characteristics … [or] benefits … of goods," and (ii) advertising a guarantee or warranty without "disclosing … any material conditions or limitations" of the benefit. CRS § 6-1-105(e), (r).

The undisputed evidence establishes each element. First, Defendants have engaged in an unfair or deceptive trade practice by knowingly selling products on Amazon that are not covered by the Otter Warranty while claiming the contrary. *See* CRS § 6-1-105(e), (r); Stmt. Facts ¶¶44-47. Second, Defendants sell their products on Amazon through the ordinary course of their business. *Id.* ¶2. Third, Defendants' misrepresentations significantly affect the public because their product listings are widely available on the Internet, on the largest e-commerce platform in

the United States, and therefore have significant potential to affect consumers. *See id.* ¶¶ 2-3, 46; *Matthys v. Narconon Fresh Start*, 104 F. Supp. 3d 1191, 1206-07 (D. Colo. 2015) (misrepresentations on a website "to the public at large" are sufficient to demonstrate a significant public impact under the CCPA). Finally, Defendants' practices injure Plaintiffs because consumers are likely to leave negative product reviews of Otter Products on Amazon if they learn after the time of purchase that the Otter Warranty does not cover their purchased product. Stmt. Facts ¶ 43.

### E. Plaintiffs Are Entitled to Summary Judgment on All of Defendants' Counterclaims.

For the reasons in section III(B), *supra*, no genuine issue of material fact exists regarding Defendants' infringement of the Otter Trademarks. Accordingly, Plaintiffs are entitled to summary judgment on Defendants' first counterclaim seeking a declaratory judgment of non-infringement.

Plaintiffs are also entitled to summary judgment on Defendants' remaining counterclaims because Defendants cannot present evidence to satisfy essential elements of these counterclaims. *See Adler v. Wal-Mart Stores*, 144 F.3d 664 (10th Cir. 1998) ("[A summary judgment] movant that will not bear the burden of persuasion at trial … may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element to the nonmovant's claim."). Defendants' second, third, and fourth counterclaims require evidence that Plaintiffs engaged in an unfair trade practice or in some way interfered with Defendants' business contracts or relationships. *See Hertz v. Luzenac Group*, 576 F.3d 1103, 1118 (10th Cir. 2009) ("To sustain a claim of intentional interference with a contract, the plaintiff must prove that the defendant … induced [a party to a contract with the defendant] to breach the contract … and

… acted 'improperly' in causing the breach"); *Occusafe, Inc. v. EG&G Rocky Flats*, 54 F.3d 618, 622 (10th Cir. 1995) (interference with prospective economic advantage requires proof that defendant "intentionally and improperly interfere[d] with [plaintiff's] prospective contractual relation"); *Rhino Linings*, 62 P.3d at 146-47 (Colo. 2003) (stating elements of CCPA).

The only conduct of this sort Defendants allege is that Plaintiffs allegedly sent "letters" to parties in contracts or business relationships with Defendants that falsely stated that Defendants sell counterfeit products.  (Dkt. No. 32 at ¶¶382, 387-388, 396-397.)  However, Plaintiffs have never reported to Amazon—or to anyone—that Defendants sell counterfeit products.  (McPherson Decl. at ¶27.)  Plaintiffs have never communicated with any third party about Defendants' sales of products bearing the Otter Trademarks.  (*Id.* at ¶27; Ex. 14 at 24:1-16.)  This evidence is uncontroverted.

Accordingly, Plaintiffs are entitled to summary judgment on Defendants' second, third, and fourth counterclaims.

## IV.    CONCLUSION

This Court should grant Plaintiffs' motion and: (1) enter summary judgment in Plaintiffs' favor on Counts 1, 2, 3, 5, and 6 of the Amended Complaint; and (2) enter summary judgment in Plaintiffs' favor on all of Triplenet Pricing Inc.'s counterclaims.

Dated: January 20, 2020                           Respectfully submitted,

                                                  By:*/s/ William D. Kloss, Jr.*
Martha L. Fitzgerald, #14078                      William D. Kloss, Jr. (Ohio Bar No. 0040854)
Brownstein Hyatt Faber Schreck LLP                Tyler B. Pensyl (Ohio Bar. No. 0080649)
410 Seventeenth Street, Suite 2200                Arryn K. Miner (Ohio Bar No. 0093909)
Denver, Colorado 80202-4432                       Vorys, Sater, Seymour and Pease LLP
Phone: (303) 223-1472                             52 East Gay Street
Email: mfitzgerald@bhfs.com                       Columbus, Ohio 43215
                                                  Phone: (614) 464-6334

Email: wdklossjr@vorys.com
tbpensyl@vorys.com
akminer@vorys.com

*Counsel for Plaintiffs Otter Products, LLC and TreeFrog Developments, Inc.*

## **STATEMENT OF COMPLIANCE**

I hereby certify that the foregoing complies with the type-volume limitation set forth in

Judge Domenico's Practice Standard III(A)(1).

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was electronically filed with the Court on January 20, 2020.  Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ William D. Kloss, Jr.*
William D. Kloss, Jr.

1/20/2020 35146404 V.17