## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

---

OTTER PRODUCTS, LLC, et al.,                Civil Action No. 1:19-cv-00510-CMA-MEH

Plaintiffs,

v.

TRIPLENET PRICING INC., et al.,

Defendants.

---

## DEFENDANT'S ANSWERING BRIEF  IN
## OPPOSITION

---

### I.       INTRODUCTION

Defendant Triplenet Pricing Inc. ("Triplenet") is a reseller of various consumer products on the internet through its Amazon storefront platform.  Defendant sells only authentic, genuine products in factory sealed and unopened packages, as obtained directly from the authorized distributors/ wholesalers of various manufacturers.  In the instant action, defendant sells a genuine Otterbox   product (a plastic cellphone cover) that is purchased from Ingram Micro, Inc. ("Ingram"), one of plaintiff's preferred distributors (**Exhibit 18**); and, in turn, is sold by defendant through its  Amazon storefront.

The product sold by defendant is the identical product, in pristine condition, and in original, unopened packaging, as initially sold by plaintiff to Ingram.  And, as it further appears, whatever constraints or restrictions imposed by plaintiff upon Ingram  in prohibiting the sale of its products to third party resellers such as the defendant, such prohibitions are on paper only since plaintiff has either permitted or consented to the sales by Ingram to various resellers, including the defendant herein.

1

Although, claiming that only its authorized dealers, distributor, or wholesalers may sell its products due to a number of alleged quality controls that are lacking by non-authorized resellers, it will be shown that plaintiff's controls are purely pretextual and do nothing except to keep competitors out of the marketplace. In fact, and contrary to Amazons listing requirements in describing the listing for a used item, plaintiff has nevertheless deemed any new product purchased from its authorized distributors for resale as being "used" solely because it has been purchased for further sale. (Exhibit 14, McPherson Dep. Tr. @ pgs. 25-26)

After a lengthy and devastating discourse, both by plaintiff and its experts, and warning of the abysmal effects of selling over the Amazon.com platform, the plaintiff hypocritically goes on to describe how it nevertheless authorizes a number of its dealers to sell its products on that very same platform. In other words, plaintiff, in blowing hot and cold in the same breath, wants to have its proverbial cake and eat it too. In reality, the real elephant in the room that is not being spoken about, are the efforts by the plaintiff to keep all reseller-discounters and, admittedly, "mom and pop stores" out of the market so that -- in truth -- it benefits from non-discounted prices while self-righteously claiming to benefit the consumer instead. (Exhibit 14, McPherson Dep. Tr. @ pg. 10)

In moving to dismiss defendant's counterclaims, the underlying issue is whether there is any true difference -- as a matter of law – between the original, genuine product obtained by Ingram from the plaintiff, when that very same product is then purchased from Ingram and, in turn, resold by the defendant to the public. Defendant's processes are no different – possibly superior – to plaintiff's authorized dealers, distributors or wholesalers. More specifically, whether plaintiff's quality controls have been devised with an aim towards to deceptively rendering its products materially different from the identical products obtained from its authorized dealers for further resale to the public. As discussed, plaintiff's so-called quality controls might look good on paper, but they have explicitly been designed to render the first sale doctrine and its progeny as totally impotent in order to purposely prohibit even a semblance of competition by third party sellers. Thus, the question arises is whether plaintiff's alleged quality controls trump the long standing first sale doctrine.

II.     **Response to Statement of Undisputed Material Facts.**

1.  Defendant Admits the allegations contained in paragraph "1" of plaintiff's Statement of Undisputed Material Facts (hereinafter "Plaintiff's Statement").

2.  Defendant Admits the allegations contained in paragraph "2" of Plaintiff's Statement.

3.  Defendant Admits the allegations of paragraph "3" of Plaintiff's Statement.

4.  Defendant Denies the allegations of paragraph "4" of Plaintiff's Statement to the extent that plaintiff is attempting to attribute the conduct or these activities of others to the defendants.

5.  Defendant Denies the allegations of paragraph "5" of Plaintiff's Statement insofar as plaintiff is attempting to attribute the conduct or activities of others to the defendants. Amazon had previously approved the defendant's ability to sell on the Amazon platform. The defendant has had a long-standing relationship with Amazon which includes transparency, support, maintenance, and an established working relationship with the Amazon Vendor team. The defendant highly regards its Amazon reputation and is not anonymous.  The defendant currently maintains in excess of 68,487 reviews with a 98% positive feedback on the Amazon platform.  Amazon has very strict metrics in place which motivates the defendant to maintain these high standards or be penalized or cut off from the 3P platform. In fact, out of 36,585 items sold – products of both plaintiff and of other various manufacturers -- defendant has received only 57 complaints or returns,    i.e.,    a defect rate of .02%. (**Exhibit 19**)

6.  Defendant Denies the allegations of paragraph "6" of Plaintiff's Statement.  Many items are listed multiple times in multiple categories across the Amazon platform.  In addition, the Amazon  Platform makes it very clear and discloses the identity of the seller from whom the buyer is purchasing from at the time they hit the "Add to Cart" button, and also other

options are offered if the buyer would like to switch the vendor that is providing the product.  (**Exhibit 20**)

7. Defendant Denies the allegations of paragraph "7" of Plaintiff's Statement insofar as attempting to attribute these findings to the defendant. Additionally, this is an issue  to be dealt with Amazon, but not with the defendant.

8. Defendant Denies the allegations of paragraph "8" of Plaintiff's Statement insofar as they do not apply to its business practices. Defendant exclusively purchases only genuine, original manufacturers products from Ingram, Otterbox's Authorized Wholesale Distributor.  (**Id**)

9. Defendant Denies the allegations of paragraph "9" of Plaintiff's Statement.  The Defendant has indeed helped to maintain the reputation and goodwill of Otterbox by offering for sale Otterbox products that was obtained through the proper Authorized Wholesale Channel.

10. Defendant partially Admits the allegations in paragraph "10" of Plaintiff's Statement insofar as product reviews are one of many ways a buyer can sort search results.  If a buyer is looking for a specific item, then the product reviews do not necessarily affect placement in the search results.

11. The allegations of paragraph "11" of Plaintiff's Statement are unknown if true.

12. The allegations of paragraph "12" of Plaintiff's Statement are unknown if true.

### III.      Statement of Additionally Disputed Facts.

13. The sale of plaintiff's products by defendant is subject to the defense of the first sale doctrine, whereby the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product.

14. Defendant sources and obtains only original and genuine Otterbox products directly from Ingram, plaintiff's Authorized Wholesale Distributor.

15. All genuine Otterbox products purchased from Ingram, are then resold in the same condition in the same packages as originally furnished by Otterbox,  i.e., in boxes that have either originally been factory sealed by plaintiff or in  boxes that can be opened.

16. When received from Ingram, Otterbox products are then reshipped by defendant -- sometimes on the same day --  to purchasers on its Amazon platform. (Blackman Dec. 2/6/22, ¶ 3)

17. Plaintiff's alleged quality controls are purely designed as a pretext to control the marketplace, to exclude the free distribution of goods over the Amazon platform, and to do an end-run around the first sale doctrine in order evade the consequences thereof.

18. None of the Otterbox products sold by Ingram have any notification printed on the outside thereof that the warranty is conditional and subject to repudiation by the plaintiff.

19. No notifications of any kind are given by Ingram to the purchasers of plaintiff's products, either on its invoices or by any other means, that Otter warranty is conditional and subject to withdrawal or repudiation by the plaintiff.

20. The following allegations are just some of the plaintiff's alleged quality controls that are purely pretextual and practically unenforceable:

   **A.**   The claim that plaintiff supervises the practices of its numerous wholesale distributors to prevent the comingling of inventory is a pretext and is practically unenforceable.

   **B.** The claim that plaintiff supervises the practices of Walmart, Best Buy, and Target, to wit, in some 40,000 retail locations and numerous warehouses around the United States, is a pretext and is also practically unenforceable. (Exhibit 14, McPherson Dep. Tr. @ pg. 7, et seq.)

**C.** Despite plaintiff's argument that sales on the Amazon platform are harmful to its business, plaintiff has nevertheless authorized a number of third-party sellers to sell on the Amazon platform.  Additionally, plaintiff also sells products directly to Amazon that are handled, sorted, and stored in Amazon warehouses, but retains no control as it claims to have over its other distributors.  (Exhibit 14, McPherson Dep. Tr. @ pg. 21, et seq)

21.   Thus, plaintiff's argument regarding its quality controls concerning both its own sales and the sales of its authorized sellers as applied to  Amazon and its warehouses is totally disingenuous.

22. The claim by plaintiff that its product as sold or fulfilled by Amazon indicates that it is sold by an Authorized Distributor by a sticker on the package is not true.  (Id @ pgs. 8-10)

23. In claiming that its product is considered to be "used" if purchased by defendant for resale from its Authorized Distributor, plaintiff's argument regarding Amazon's listing policy is misleading and most disingenuous. (Id @ pg. 25)  An item is only considered as being "used" under Amazon's listing policy (a) if fairly worn but continues to function properly; (b) if the item shows wear from consistent use; (c) if it has seen limited use and remains in good working; or (d) if with minor damage and original wrapping is missing. (Exhibit 10).

24. Plaintiff had also never notified Amazon that its products were "gated," meaning that sellers must first obtain its permission before listing its products for sale on Amazon.  Thus, defendant's properly listed plaintiff's products for sale on their Amazon storefront.

25. Exhibit No. "8" annexed to plaintiff's moving papers, the Otterbox Warranty, is a misleading document.  It is demonstrably **not the same document** as is actually packaged with its products.  The Warranty actually provided by the plaintiff is microscopic and practically illegible; and, when enclosed in a sealed box, the consumer is unable to know of its contents or the terms thereof prior to making a purchase.  (**Exhibit 21**) Accordingly,

6

that Warranty is plainly a pretext to support plaintiff's allegations of maintaining quality controls over its products. Thus, it's Warranty should be deemed invalid, disregarded, and given no effect at all, especially since a consumer is never apprised of its terms until after having first made the purchase.

26. Insofar as plaintiff's Warranty is neither legible nor published for pre-purchase inspection either by a consumer or even the defendant, it should be deemed invalid and unenforceable. Accordingly, the applicable provisions of Colorado's Uniform Commercial Code should be applied as may so be applicable.

27. Additionally, the intentional failure to publish its Warranty for pre-purchase inspection by a consumer, as well as submerging that Warranty deep inside of a sealed box and in illegible format, subjects the sale to the provisions of Colorado's Uniform Commercial Code, thus, hindering plaintiff's attempt to sell a proverbial cat in a bag to the public. This court should not look favorably upon plaintiff's foregoing actions nor reward it for its conduct.

28. Lastly, plaintiff comes into court with dirty hands and should be denied any and all relief whatsoever. Plaintiff sells its products in the state of New York, either through the Amazon platform or its authorized distributors. Although New York state prohibits manufacturers from limiting their warranties due to the fact that a product was not purchased from a particular seller, plaintiff, nevertheless, refuses to honor any of its so-called warranties for products purchased from a non-authorized distributor. **GBL § 369-B** In short, plaintiff, although seeking relief from this court, is admittedly thumbing its nose at a law specifically enacted to protect consumers in New York by prohibiting this sort of conduct while, as the same time, benefiting from its sales into that state.

In all, plaintiff has designed a number of so-called quality controls  although abstract and theoretical, they cannot be implemented and have been designed as pretexts to prevent competition and keep others from entering the marketplace.  It is respectfully submitted that if any customer confusion is caused  absent its so-called controls, any such issues should be determined by a trier of the facts and not ruled upon as a matter of law.

## IV.    DISCUSSION AND ARGUMENT

### A.    Plaintiff's False Quality Controls.

Can this court hold that, as a matter of law, plaintiff's alleged quality controls  eliminate the application of the first sale doctrine?  We think not.  Plaintiff's alleged quality controls as referred to at page "5" of its moving brief are not only disingenuous, but have only been designed solely to appear as a semblance of control.  One could readily see through the smokescreen created by these controls.  More specifically:

- "Inspecting Otter Products promptly upon receipt, removing products from inventory that are damaged or show signs of tampering, and reporting such products to Plaintiffs;"

Query:  Are plaintiff's 40,000 plus distributors throughout the United States (i.e., Walmart, Best Buy, Target, etc.) supposed to open each and every package when received for inspection and testing?  We think not as this alleged control is purely a deception.  During his deposition, plaintiff's witness walked this claim back a bit stating that plaintiff relies upon reports from its regional managers. (Exhibit 14, McPherson, Dep. Tr. @ pg. 7, et seq)  However, when a request was made for production of these reports during the deposition, and also subsequent thereto in a post-deposition document demand for copies of thereof, plaintiff failed to comply and served defendant with nothing.

- "Storing and handling Otter Products in accordance with instructions provided by Plaintiffs;"

Query:  Is plaintiff's product in question (a simple plastic cell phone cover) affected by weather conditions;  does it decay;  or – as plaintiff had absurdly testified – could it be affected when placed in an area of a warehouse where were rabbits and livestock were present?  Again, this is nothing but a diversionary tactic and not a true quality control.  (Id @ pgs. 5, et seq)

- "Cooperating with any recall or other consumer safety information dissemination effort conducted by Plaintiffs, as well as any investigation by Plaintiffs into product quality;"

Query:  What safety information or recall can there be with a product that is purely a simple piece of plastic purchased from Ingram.  Nevertheless, since purchased from Ingram, defendant would presumably receive notice from Ingram and disseminate this information to the consumer. This alleged control is purely a pretext.  And, if at all applicable, plaintiff has refused to furnish defendant with all post-deposition discovery documents relating to any alleged recalls and so-called quality controls.

- "Not relabeling, repackaging, or otherwise altering any Otter Product, any accompanying literature, or serial number;"

Defendant purchases, stocks, and sells only authentic and genuine products obtained from plaintiff's authorized dealers, and in no way repackages or alters plaintiff's product or serial numbers. Of course, plaintiff absurdly claims that the unauthorized sale of its product by defendant renders it as having been "used" and materially different due to its limited Warranty. (Exhibit 14, McPherson, Dep. Tr. @ pgs. 25-26) However, as hereinafter discussed, plaintiff's Warranty should – on its face -- be deemed to be totally invalid and voided by this court.

- "Not selling Otter Products to anyone who is not an Authorized Seller and who intends to resell the products;" and

The resale of Otter products by defendant and the first sale doctrine are at the heart of this case.

- "Reporting any safety issues or complaints about Otter Products to Plaintiffs."

Query: What safety issue can there be with a piece of plastic?  Again, this is nothing but a disingenuous and manufactured requirement to evade the first sale doctrine.  And, if there were any such issues, plaintiff has failed to provide them and respond to defendant's post-deposition discovery

demand.  Furthermore, defendant always has the ability to report back to Ingram any potential safety issue or complaint; and Ingram, in turn, would then notify the plaintiff thereof.

Plaintiff also seeks to attribute the fact of monitoring and documenting its sales as somehow being beneficial to the consumer.  Again, this is just another of its efforts to create another so-called product control that is totally valueless except for plaintiff's own financial controls and its bookkeeping procedures.

A trier of the facts can readily determine that these so-called controls are nothing but a contrived deception masquerading as an effort by plaintiff to keep and maintain a high quality for its goods.  However, upon further examination of the realities involved, and whether these controls are actually carried out and adhered to by the plaintiff,  it is the plaintiff that is using these devices to maintain its pricing and to keep those who would only benefit the consumer totally shut out of the marketplace.

### B.      The First Sale Doctrine.

The first sale doctrine has been in effect since *Prestonettes v. Coty*,  264 U.S. 359, 44 S.Ct. 350 (1924), 68 L.Ed 731.  It is also found it the Restatement (Third) of Unfair Competition, § 24 (2009).  Under the first sale doctrine, "the right of a producer to control distribution of its trademarked product does not extend beyond the first sale of the product." *Beltronics US Beltronics USA, Inc. v. Midwest Inventory Distribution LLC*, 522 F.Supp.2d 1318 2007 WL 335566, citing *Australian Gold,* 436 F.3d at 1240–41 (10th Cir.2006) (quotations omitted). In this In this circuit's only case evaluating this doctrine in connection with a Lanham Act claim, the court observed that "the essence of the 'first sale' doctrine [is] that a purchaser who does no more than stock, display, and resell a producer's product under the producer's trademark violates no right conferred upon the producer by the Lanham Act." *Id.* at 1241 (quotations omitted).  This is exactly what we have in the instant case.  That is, the purchaser -- Triplenet -- does no more than stock, display, and resell the Otterbox product under the Otterbox trademark.  Any argument that the product has been rendered materially different because of the Otterbox Warranty must fail.

However, courts have recognized two exceptions to the "first sale doctrine": (1) "material difference" and (2) "quality control." In Beltronics USA, Inc., the Tenth Circuit held, "as other federal circuit courts have held, that the unauthorized resale of a materially different trademarked product can constitute trademark infringement." Id.

This court recently discussed these exceptions in *Otter Products, LLC,* and *Treefrog Developments, Inc. v. Phone Rehab, LLC,* et al., 2019 WL 4736462.  In holding that the Otter plaintiff met the requirements of the "material difference" exception in that its Warranty was limited only to consumers who purchased its product through an authorized dealer or distributor. However, neither the court nor the defendant raised the issue of whether the Warranty was at all valid in the first place.  And, now, as appearing in the first instance, the defendant herein is challenging the validity of the plaintiff's Warranty.

The plaintiff should be precluded from claiming that the lack thereof is a "material difference" between its product and the same product as sold by the defendant.  This court should hold that, on its face, the Warranty actually included with its products is invalid based upon the following factors:

- The Warranty appears to be printed in miniscule 3- or 5-point type and is virtually illegible. (**Exhibit 21**)

- The Warranty is packaged in a sealed box, thus, not being published for pre-purchase inspection and preventing the consumer from knowing what he is purchasing until the purchase is made. (**Id**)

- The boxes containing plaintiff's product make no reference on the outside to the plaintiff's Warranty contained within, thus, compelling the consumer to purchase a cat in a bag. (**Id**)

Insofar as plaintiff's limited  Warranty is plainly foisted upon the consumer who is given no prior knowledge of its terms unless first making the purchase, the applicable provisions of the Colorado Uniform Commercial Code should kick in and protect the consumer against this deliberate machination by the plaintiff that is really intended to prevent others from entering the market place.  More specifically, the implied warranty of merchantability, CO Rev Stat § 4-2-314

(2016); and, as particularly applicable hereto, CO Rev Stat § 4-2-316 (2016), Exclusion or modification of warranties, which, in part, provides that:

> "2) Subject to subsection (3) of this section, to exclude or modify the implied warranty of merchantability or any part of it, the language must mention merchant notability and in case of a writing must be **conspicuous**, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and **conspicuous**. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that warranties which extend beyond the description on the face hereof.'"

The court should recognize plaintiff's Warranty for exactly what is: nothing but a self-serving inconspicuous ploy designed for the sole purpose of hoodwinking the consumer while at the same time overcoming the effects of the first sale doctrine. Thus, it is respectfully submitted that the very least it can do is to rule that plaintiff's Warranty is – on its face -- null and void, deny its use as a pretext to overcome the first sale doctrine, and afford it a decent and proper burial.

### C. Plaintiff's Claims For Summary Judgment Are Based Upon A Disingenuous, Fraudulent, And Invalid Warranty.

The only thing that plaintiff can possibly try to hang its proverbial hat on is its so-called Warranty that comes with the purchase of its product. It is clear that the limitations on its Warranty were specifically created so that plaintiff's product could be deemed "materially different" from the same -- in fact, identical -- product as sold by the defendant. The only difference is that plaintiff refuses to honor it's Warranty since the product was purchased from a third-party seller. Thus, with this sleight of hand, the unknowing consumer is deceived and taken in when purchasing the very same, identical, and most genuine product from a reseller, but only to later find out that he was fooled by the manufacturer since – for the first time – he discovers that it refuses to honor its Warranty. Unfortunately, every reseller -- including the defendant -- who purchases Otter products from its authorized distributors are likewise deceived when not being informed of its questionable Warranty. The fact is that the product sold by the defendant does indeed come with the Otter Warranty, but it is Otter, the plaintiff manufacturer – not the defendant -- that refuses to honor it.

Plaintiff's Warranty is nothing but a clever ploy created to escape the first sale doctrine and force competitors from the marketplace. It is in complete disregard of the consumer who only discovers its limitations until after the purchase has been made. Plaintiff has also intentionally printed its Warranty in illegible -- practically microscopic – font which renders it hollow and totally worthless. Additionally, none of plaintiff's packages contain any pre-purchase notifications regarding the limitations of its Warranty until after the consumer has already parted with his money. It should not take long to determine that the plaintiff has no regard whatsoever for the consumer, but has adroitly created the Warranty as an intentional deception for its own use and benefit instead.

## V.    CONCLUSION

In light of the foregoing, it is respectfully submitted the court should determine that, plaintiff's Warranty is its Achilles heel and – on its face – is totally invalid. And, in doing so, the aforementioned provisions of the Colorado Uniform Commercial Code should replace plaintiff's deliberately misleading and anti-consumer maneuver. Accordingly, since each the remaining arguments of plaintiff's motion are founded upon an invalid Warranty, they must all collapse in upon each other like a house of cards, i.e., Count 1, plaintiff's claims of likelihood of confusion; Count 2, the sale of non-genuine products; Count 3, false advertising; and Count 4, deceptive trade practices.

Dated, February 7, 2020.                    Respectfully submitted,

                                            ANTAR LAW FIRM, PLLC
                                            By, _____/S/_____
                                            SOLOMON E. ANTAR, ESQ.
                                            Attorney for Defendant
                                            26 Court Street, Suite 1200
                                            Brooklyn, NY 11242
                                            Tel. 718-769-3200
                                            solomon@antarlawfirm.com
                                            New York State Bar ID No. 1321116
                                            Colorado federal bar admission 2/25/2019

**STATEMENT OF COMPLIANCE**

I hereby certify that the foregoing complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(1).

*/s/ Solomon E. Antar*
Solomon E. Antar

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was electronically filed with the Court on February 7, 2020. Notice of this filing will be sent to all counsel of record by operation of the Court's electronic filing system.

*/s/ Solomon E. Antar*
Solomon E. Antar

# EXHIBIT 19



**Solomon Antar <solomon@antarlawfirm.com>**

---

## Order Defect Rate

1 message

---

**israel@discovergroup.net** <israel@discovergroup.net>
To: Solomon Antar <solomon@antarlawfirm.com>

Mon, Apr 29, 2019 at 9:51 AM

---

### Customer Service Performance

|  | Seller Fulfilled | Fulfilled by Amazon |
|---|---|---|
| **Order Defect Rate** **Target**: under 1% | 0.2% 73 of 36,585 orders 60 days | N/A |

Order Defect Rate consists of three different metrics:

- Negative feedback

  0.16%
  57 of 36,585 orders          N/A

- A-to-z Guarantee claims

  0.05%
  17 of 36,585 orders          N/A

- Chargeback claims

  0%
  1 of 36,585 orders           N/A

# EXHIBIT 20



Try Prime

All p2419h

Hello, Eric
Account & Lists

Returns
& Orders

Try Prime

2
Cart

Deliver to David
Brooklyn 11224

Eric's Amazon.com Prime Video Help

Shop Galentine's gifts

Computers Laptops Desktops Monitors Tablets Computer Accessories PC Components PC Gaming Deals

Save on TVs and Home Audio for the big game Shop now ›

‹ Back to results

Roll over image to zoom in

View in your room
See this product in your space before you buy

# Dell P Series 24" Screen LED-Lit Monitor Black (P2419H)

by Dell

283 ratings
| 62 answered questions

Amazon's Choice for "p2419h"

List Price: ~~$249.99~~
Price: $159.00 & **FREE Shipping**.
Details & FREE Returns
You Save: $90.99 (36%)

Get $50 off instantly: Pay $109.00 upon approval for the Amazon Rewards Visa Card.

Free Amazon tech support included

Style: **Single**

Monitor + HDMI Cable
$165.99

Monitor + MK270 Keyboard and Mouse
$180.24

Monitor + MK345 Keyboard and Mouse
$189.99

Monitor + MK545 Keyboard and Mouse
$207.99

**Single**
**$159.00**

- More room to work: Free up valuable desk space with a thin monitor profile and a small monitor base; Contrast Ratio: 1000:1
- Consistent and rich colors: A wide viewing angle enabled by In-Plane Switching technology lets you see vibrant colors—no matter where you sit
- Expand your efficiency: The three-sided ultrathin bezel design lets you enjoy an uninterrupted view of your content across multiple monitors
- This TUV Certified monitor has a flicker-free screen with Comfort View, a feature that reduces harmful blue light emissions. It's designed to optimize eye comfort even over extended viewing
- 60 hertz

Compare with similar items

New & Used (35) from $146.06 + FREE

$159.00
& **FREE Shipping**. Details
& FREE Returns

Arrives: **Jan 31 - Feb 3**
Fastest delivery: **Tue, Jan 28**
Order within 27 hrs 16 mins

David - Brooklyn 11224

In Stock.

Qty: 1

Add to Cart

Buy Now

Ships from and sold by Amazon.com.

**Item arrives in packaging that reveals what's inside.** To hide it, choose **Ship in Amazon packaging** at checkout.

**Add a Protection Plan:**
- [ ] 4-Year Protection for $29.99
- [ ] 3-Year Protection for $21.99

- [ ] Add gift options

Add to List

New & Used (35) from
$146.06 + FREE Shipping

Share

**Other Sellers on Amazon**

$164.99 Add to Cart
+ Free Shipping
Sold by: Woot

$169.99 Add to Cart
+ Free Shipping
Sold by: Triplenet Pricing INC

$175.80 Add to Cart
& **FREE Shipping** on eligible orders.
Details
Sold by: Electronics Basket

SIDETRAK®
Now Attachable

# EXHIBIT 21

EXHIBIT

5

McPherson

AGREN BLANDO REPORTING
12/9/19

OTTERBOX GLOBAL
LIMITED WARRANTY

GARANTIE LIMITÉE
INTERNATIONALE OTTERBOX

20-53050_B